**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GINMAR CORPORATE PROMOTIONS, INC. )
and GINA CANTAVE, )
 )
    Plaintiffs, )
 )
  v. )
 )
CARDINAL HEALTH, INC. )
 )
    Defendant )
 )

```
FILED: JULY 21, 2008
08 cv 4109
JUDGE DARRAH
MAGISTRATE JUDGE COX
JH
```

Demand for Jury Trial

## COMPLAINT

  Plaintiffs, by their counsel, as and for their Complaint against Defendant assert upon information and belief as follows:

## PRELIMINARY STATEMENT OF THE CASE

  1.  This case seeks to recover damages for economic harms and losses suffered by GINMAR CORPORATE PROMOTIONS, INC. and GINA CANTAVE ("Plaintiffs") as the direct and proximate result of the wrongful conduct of CARDINAL HEALTH, INC. ("Defendant").

  2.  Cardinal Health, Inc. (hereafter "Cardinal") is one of the largest corporations in America and, according to Fortune magazine's May 8, 2008 ranking, is the 19th largest Fortune 500 Corporation.  This case seeks to hold Cardinal accountable for unlawfully taking advantage of an impressive and successful African-American businesswoman who was one of its leading subcontractors and protégés.

3.      Cardinal paraded around the owner of Ginmar Corporate Promotions, Inc. (hereafter "Ginmar"), Ms. Gina Cantave (hereafter "Cantave"), as one of its top women and minority suppliers.  Cardinal brought Cantave to awards dinners (including one at which she was asked to sit at the table next to Cardinal CEO Kerry Clark) and touted her work, all the while promoting Cardinal's commitment to minority suppliers on Cardinal's website and in flashy brochures stating that Cardinal "has a strong commitment to diversity" and works "responsibly and with integrity".

4.      Plaintiffs will show that Cardinal took advantage of Cantave by using Ginmar's status as a woman and minority subcontractor to obtain multi-billion dollar federal government contracts then discarded Ginmar and Cantave, leaving Cantave at the brink of bankruptcy.

## PARTIES AND JURISDICTION

5.      Gina Cantave immigrated to America from her native Port-Au-Prince, Haiti in 1972.  From nothing, she built a successful fashion boutique in Chicago's Hyde Park neighborhood by 1987.  Next, she entered the corporate world as an account executive for Gateway Outdoor Advertising and was named Rookie of the Year. She quickly scaled the ranks of the outdoor media industry and moved to Eller Media Company, a wholly-owned subsidiary of Clear Channel Communications, the company that lured Ms. Cantave away from Gateway because of her business talents and savvy.  Her success allowed her to purchase a condo in Chicago's Gold Coast neighborhood at the age of 30.  As a single mother, she put her daughter through college at the University of Illinois and Northwestern University's Medill School of Journalism.  Ms. Cantave branched out on her own, forming Ginmar Inc. in 1996 which grew into a successful promotional and advertising company representing numerous Fortune 500 clients.

6.      Ginmar Corporate Promotions, Inc. is a woman and minority owned small business.  Ginmar is registered with the Small Business Administration ("SBA") as a Small Disadvantaged Business ("SDB") MBE/WBE and is a promotional products and print representative company based in Chicago, Illinois.  Cantave and Ginmar have now done business with Cardinal for a nine year period, the last three of which were under an exclusive contract from June 1, 2005 to June 1, 2008.

7.      Jurisdiction is proper in this Court against the Defendants pursuant to:

(a)      28 U.S.C. § 1332, in that Plaintiff GINMAR CORPORATE PROMOTIONS, INC. is a corporation with its principal place of business in the State of Illinois, Plaintiff GINA CANTAVE is an individual residing in the State of Illinois and Defendant CARDINAL HEALTH, INC. is a corporation with its principal place of business and address at 7000 Cardinal Place, Dublin, Ohio, and regularly conducts business in the State of Illinois.  Additionally, the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

(b)      28 U.S.C. §1391, in that jurisdiction is founded only on diversity of citizenship, and the United States District Court for the Northern District of Illinois is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

8.      At all times relevant, upon information and belief, Defendant was and is a corporation organized and existing under the laws of the State of Ohio.

9.      At all times relevant, upon information and belief, Defendant was and is a corporation with its principal place of business in the State of Ohio.

10.     At all times relevant, upon information and belief, Defendant was and is a foreign corporation authorized to do business in the State of Illinois.

11.     At all times relevant, upon information and belief, Defendant was and is a business entity actually doing business in the State of Illinois.

12.     At all times relevant, upon information and belief, Defendant was and is a global manufacturer and distributor of medical and surgical supplies and technologies with customers located on five continents and including some of the world's largest hospitals, medical centers, retail and mail-order pharmacies, clinics, physicians, pharmacists and other health care providers.

13.     At all times relevant, upon information and belief, Defendant engaged in the business of manufacturing and distributing medical and surgical supplies and technologies, and in pursuit of the business, transacted business within the State of Illinois and contracted to provide goods and services in the State of Illinois.

14.     At all times relevant, upon information and belief, Defendant breached its contract with the Plaintiffs which caused injury to Plaintiffs inside the State of Illinois.

15.     At all times relevant, upon information and belief, Defendant regularly does and solicits business and engages in a persistent course of conduct in the State of Illinois, deriving substantial revenue from goods and products manufactured and distributed in the State of Illinois.

16.     At all times relevant, upon information and belief, Defendant expected or should reasonably have expected its acts to have consequences in the State of Illinois.

17.     At all times relevant, upon information and belief, Defendant derived and continues to derive substantial revenue from interstate and international commerce.

18.    Plaintiff Ginmar Corporate Promotions, Inc. (hereafter "Ginmar") is a small, minority-owned corporation in the business of promotional products and print with its principal place of business at 770 N. LaSalle St. in Chicago, Illinois.

19.    Plaintiff Gina Cantave (hereafter "Cantave") is the sole owner and founder of Ginmar and is a resident of the State of Illinois.

## FACTUAL ALLEGATIONS RELATED TO ALL COUNTS

20.    In 1999 Cardinal approached Ginmar and suggested doing business with her, but only if she became certified as a Small and Disadvantaged Business with the United States Small Business Administration.  In retrospect, Cardinal's objective was clear: federal regulations provide monetary incentives and preferential treatment to those prime contractors, like Cardinal, who represent that they subcontract with minority and women-owned businesses.

21.    Cardinal and Cantave signed an exclusive agreement (the Promotional Products Agreement, or "PPA") that took effect on June 1, 2005.   The agreement provided that Ginmar would supply Cardinal with custom promotional products – goods and items with Cardinal's logos and slogans – for renewable one-year periods and Ms. Cantave was repeatedly advised that the contract would be worth between $1.5 million to $3 million per year for at least three years. Induced by Cardinal's repeated oral and written promises, Ginmar devoted more and more resources and time to the Cardinal account.

22.    On April 3, 2003, Ms. Kathy Benn, Vice President of Supplier Diversity at Cardinal, offered Ginmar the opportunity to become a protégé under Cardinal's formal Mentor Protégé Program, given Ginmar's newly acquired SDB status. (The "Mentor-Protégé Program" was apparently created by Cardinal in its ongoing successful efforts to obtain massive billion

dollar contracts with the Department of Defense, which gives financial credit for having such programs.)

23.    On or about May 6, 2003, Ginmar and Cardinal signed a formal Mentor Protégé Agreement ("MPA").  This mentoring initiative focused on identifying and aligning the resources of Ginmar with those of Cardinal.  The MPA symbolized Cardinal's promise to nurture and protect the small, woman and minority-owned Ginmar.

24.    Although the MPA required Cardinal to submit to Ginmar quarterly evaluation reports of Ginmar's work, no such reports were ever prepared by Cardinal.

25.    Ginmar relied in good faith on Cardinal's promises and phased out numerous other smaller clients and potential clients to concentrate on Cardinal, its mentor in name only.

26.    On March 9, 2004 at Cardinal's headquarters in Dublin, Ohio, Mr. Malik Malone, Cardinal's then-Corporate Director of Supplier Diversity, informed Cantave that Cardinal would welcome a bid from Ginmar on Cardinal's national exclusive contract to provide all of Cardinal's requirements for promotional products.  Malone emphasized that because Ginmar was a "Cardinal Protégé", Cardinal would assist and groom Ginmar so that the diverse company would have a reasonable opportunity to earn the contract, which would be of three-year duration and which was estimated to be worth in the neighborhood of $8 million in annual revenues. (The custom portion of the $8 million in annual revenues would go to Ginmar; later to be estimated at between $1.5 million to $3 million annually.)

27.    At this time, Ginmar did not suspect any ulterior motive on the part of Cardinal and devoted all of its resources to earning the contract.

28.    In July, 2004, Malone was moved to a different department within Cardinal and was replaced by Mr. Lamont Robinson as Cardinal's Corporate Director of Supplier Diversity. Robinson reported to Ms. Kathy Benn and Ms. Linda Morgan at Cardinal.

29.    Cardinal presented Robinson to Ginmar as its "Corporate Sponsor". Robinson was to assist Ginmar in navigating through various business unit issues and would be responsible for facilitating the success of the mentoring agreement. Ginmar relied heavily on Robinson, trusting him to be responsible for promoting and encouraging Ginmar's participation in assisting Cardinal's sales force as well as private sector customers in understanding the benefits of using SDBs as suppliers whenever possible to achieve Cardinal's goals in meeting subcontracting expectations under the SBA's guidelines.

30.    Eventually it became apparent to Cantave that Robinson himself was fighting an uphill battle within the ranks of Cardinal. Robinson, in the presence of Cantave, was constantly forced to reassure Cardinal executives at meeting after meeting that it was safe to purchase products from minority-owned businesses and that the products would not be inferior simply because they were supplied by a minority-owned business such as Ginmar.

31.    Nevertheless, Robinson and Morgan advised Cantave that, as part of Cardinal's professed commitment to serving as Ginmar's mentor, Ginmar would have the opportunity to be introduced to Cardinal's clients and partner organizations, in an effort to grow Ginmar's business.

32.    At the Small Business Procurement Conference in Dublin, Ohio, during September 2004, Mr. Bob Wagner, Cardinal's Vice President of Strategic Sourcing, gave a PowerPoint presentation on doing business with Cardinal. During the presentation, he announced Ginmar's opportunity to bid on Cardinal's promotional products contract due to

Ginmar's commitment and perseverance in its business dealings with Cardinal.  He also asked Cantave to address the audience on how she had earned such a coveted opportunity from Cardinal.  Cantave welcomed the opportunity and proudly addressed the audience, not suspecting that in reality she, and others like her, were helping Cardinal far more than Cardinal was helping them

33.    In January, 2005, Morgan telephoned Cantave and explained that Cardinal intended to devise a contractual arrangement for all of Cardinal's requirements for promotional products.  Under this plan, Cardinal would have two suppliers, one of which was to be a Small Disadvantaged Business/Minority-owned Business/Woman-owned Business.  Morgan told Cantave that Ginmar had been chosen as the diverse supplier.

34.    That same month, Cantave met in Chicago with Morgan and Ms. Anne Bouchenoire, Vice President of Branding at Cardinal, to discuss how the contracts for promotional products would be divided between the two suppliers, as well as how to safeguard the brand guidelines.  Cantave was told that American Identity ("AI") had been chosen as the major supplier to replace WorkflowOne.

35.    Numerous meetings between Cantave and Cardinal management ensued with the purpose of ironing out details and to "determine the level of spend to be allocated to Ginmar to meet SBE requirements over time."  During a key meeting on January 19, 2005, Cantave was advised that Ginmar's portion of the promotional products contract would bear annual revenues of between $1.5 million to a potential in excess of $3 million annually for a 3-year contract.  The January 19th meeting was attended by Morgan, Bouchenoire, Ms. Betty Blumenauer (Director, Corporate Meetings and Events at Cardinal), Robinson, and Cantave.  The meeting took place at American Identity's corporate offices, headquartered in Overland Park, Kansas.  After that

meeting, on several conference calls with Linda Morgan, Lamont Robinson and Gina Cantave,

Morgan and Robinson both reiterated that Ginmar could expect to receive at least $1.5 million

and up to $3 million per annum.

36.     Pursuant to the "One Cardinal Health Initiative" – a plan to hire exclusive

suppliers for each Cardinal purchasing need -- Cantave was invited to Cardinal's national

operations and sales meetings throughout the U.S. during early 2005.  Accordingly, and at

Ginmar's expense, Cantave traveled to Cardinal Headquarters at Dublin, Ohio and to numerous

other locations around the country to visit every Cardinal business segment (i.e. Medicap,

Medicine Shoppe, Leader Pharmacies, Pyxis/Aliris Products, etc.).  It was the parties'

expectation that all such business segments at Cardinal would thereafter place all future custom

promotional products orders with Ginmar.  Unbeknownst to Cantave at the time, this junket

carried with it added benefit to Cardinal which was now publicly seen as a champion of

diversity.

37.     This pattern continued for the next two years, as Cantave traveled over thirty (30)

times for business meetings, sample shows and other Cardinal events to promote Cardinal's

supplier diversity initiative.  At such events, Cantave was introduced to Cardinal executives in all

business units as Cardinal's diverse supplier for custom promotional products.

38.     In anticipation of the forthcoming contract, Ginmar incurred significant expense

in a number of ways.  First, it began developing a web site for custom promotional products for

Cardinal Health in February 2005.  The web site was completed in June 2005 and launched in

July 2005.  During this period, Ginmar also set about hiring additional staff necessary to service

Cardinal's requirements and acquired and upgraded its technology to support the expected

increase in sales volumes.  Additionally, Ginmar rented a much bigger office space in 2006 to accommodate the expected increase in business.

39.    Under Sections 6 and 7 of the contract, the contractual relationship automatically renews on June 1st of each year unless, not less than 120 days before the end of the then-current term, either party delivers notice to the other party stating an election to terminate.  Cardinal never attempted to terminate the contract until it sent a January 28, 2008 letter, thereby triggering the termination date of June 1, 2008.[1]  Therefore, a binding contract was in place from June 1, 2005 until June 1, 2008.

40.    Ms. Cantave was repeatedly assured that the contract was exclusive.  Further, in consideration for an exclusive agreement, the contract at sections 3 and 4 explicitly granted Cardinal a price discount of 17% and a rebate for large volumes of business.

41.    Cardinal's own strategic sourcing organization chart details at step 6 that it is to "Implement Exclusive Suppliers" meaning the practice was to engage exclusive suppliers. Another Cardinal document plainly lists Ginmar as an "exclusive supplier" and the document makes clear that Cardinal has a preference for using exclusive suppliers like Ginmar because it saves millions of dollars so doing.  Cardinal's own website referred to Ginmar as its "exclusive supplier."

42.    From the outset, Cardinal took steps to ensure the compliance of its various business units in honoring the exclusive contract.  Emails clearly show enforcement efforts were made with that intent.  For example, an email from Ms. Erin Smith, Manager of Strategic Sourcing at Cardinal, dated June 24, 2005, encouraged Cantave by stating the following:  "*Great news – the notice went out today to executives at various Cardinal Health business units*."  The

---

[1] By this time, Cardinal and Ginmar had been negotiating in contemplation of litigation for six months.

said "notice" referred to by Smith was an email authored by Mr. Mark Hartman, Executive Vice President of Strategic Sourcing, and the signatory of Ginmar's contract with Cardinal. In that email, Hartman explicitly directed executives to comply with the exclusive supplier agreement which had been negotiated with Ginmar.

43.     Furthermore, after a staff meeting with regard to "Compliance Reporting", held on the morning of July 11, 2005, Ms. Terri Stentz, Director of Strategic Sourcing, sent an email to Erin Smith, Ms. Nikki Frazier and Ms. Rachelle Miller recapping the meeting and encouraging them to reach out to their vendors in order to generate accurate weekly Compliance Reports. On July 27, 2005, Erin Smith, Manager of Strategic Sourcing, sent an email to Ginmar which emphasizes Cardinal's reporting efforts and compels Cardinal employees/managers to "*track non-compliant business spend by location to hold them accountable and coach for improvement*" and otherwise assured Ginmar that locations would be held accountable for any transgressions. "Non-compliant business spend" refers to money spent by executives going "outside the contract" and purchasing from suppliers other than Ginmar.

44.     Cardinal breached the contract virtually from the outset. Cardinal failed under the requirements contract to deliver the volume of business promised to Ginmar. Cardinal further breached the contract by obtaining custom promotional goods from suppliers other than Ginmar and those suppliers were not SDBs. Instead, on information and belief, some were friends of Cardinal executives.

45.     Cantave and Ginmar quickly discovered that the corporate climate at Cardinal was one of barely-veiled racism in which decision-making executives were resistant to accept higher-level policies. Instead, those decision-making executives excluded minority-owned businesses and gave business to their personal friends. "The powers that be" at Cardinal failed to

control their middle managers and must ultimately be held responsible and accountable to Cantave and Ginmar.

46.    Ginmar received tremendous resistance from middle managers throughout the company, particularly from staff in the Meetings and Events departments at Cardinal's three principal corporate offices in Dublin, Ohio; McGaw Park, Illinois, and San Diego, California. Staff in these units had previously enjoyed substantial leeway in placing orders for custom promotional products with whomever they wished, which gave them prestige vis-à-vis suppliers who, as is customary in the promotional products industry, then "incentivized" purchases from their respective companies to Meetings and Events Staff at Cardinal.

47.    On information and belief, Ms. Betty Blumenauer, began working even before the Ginmar contract was signed to sabotage the Ginmar contract.   Blumenauer had previously been the executive assistant to the founder and now Chairman of the Board of Cardinal, Robert Walter.  From the beginning Blumenauer displayed an animosity towards Ginmar and a resolve to breach the contract.

48.    Another illuminating example of Blumenauer's determination to sabotage Ginmar's standing with Cardinal occurred in 2005 when Ginmar gave Blumenauer a quote for a Tumi brand bag, which was to be a gift for a Cardinal executive. Tumi is a very fashionable and expensive brand, yet in a telephone conversation with a Ginmar employee, Blumenauer dismissed the product as "cheap luggage."  Tellingly, however, Cantave was told shortly thereafter by Linda Morgan that subsequent to her having received the quote from Ginmar, Blumenauer purchased an identical Tumi bag from another supplier.  Upon learning of this, Cantave objected to the purchase as being unauthorized under the contract.  Morgan

acknowledged this fact and assured Cantave that Blumenauer would be "brought in line" and that such contraventions of the contract would not happen again.

49.    Blumenauer, however, was not "brought in line" and continued to violate the contract while defaming Cantave and Ginmar.  Blumenauer suggested to Cantave that Ginmar should hire and/or collaborate with Ms. Jen Walsh, a personal friend of Blumenauer's, whom Blumenauer had previously utilized for promotional product needs.  This suggestion was made in an email dated May 16, 2005 to Ms. Erin Smith.  Blumenauer asked Cantave to schedule a meeting with Walsh to see if they could work together so that the latter could then send business to the Callard Company, a promotional products company situated in New Albany, Ohio notwithstanding the fact that the Callard Company was not a WBE at that time.  Cantave later met with Walsh and told her that Blumenauer had suggested they may be able to work together. Walsh, however, stated to Cantave that although she appreciated what Blumenauer was trying to do, she (Walsh) was already working for the Callard Company.  At that point, Cantave and Walsh agreed that since they were, in fact, competitors and that neither Callard nor Walsh had any rights under Cardinal's current contract for promotional products, it would be a conflict for them to work together.

50.    Blumenauer engaged in a harmful pattern wherein she would criticize Ginmar's performance under the contract despite the glowing praise and outstanding marks Ginmar consistently received in its corporate evaluations.  Ginmar, in good faith, made numerous efforts to approach Blumenauer, address her concerns, and resolve them.  All such good faith efforts to reconcile differences with Blumenauer were summarily rejected without any due consideration and with no rational basis.  Throughout the course of the relationship, Blumenauer defamed Cantave and Ginmar by repeatedly referring to Ginmar's products as "cheap" and "inferior"; by

referring to Ginmar staff as "unprofessional"; and by referring to Ginmar staff as "lacking creativity".

51.     In due course, Ginmar began to experience similar hostility and race-based discrimination from other Cardinal executives who were part of Blumenauer's clique or who were intimidated by Blumenauer.  Upon information and belief, Blumenauer and her clique harbor a deeply prejudicial and racist belief that minorities, particularly African-Americans, including Cantave, are incapable of performing jobs or providing service as well as whites.

52.     Many members of Blumenauer's clique, like Blumenauer, worked in the Meetings and Events Department at Cardinal Health.  Indeed, the evidence suggests that the overwhelming and virtually exclusive source of criticism with respect to Ginmar's performance emanated from the Meetings and Events staff.  Ms. Blumenauer's close associates include Jennifer McEwen and Michelle Coad.  Upon information and belief, Blumenauer, McEwen, Coad, and Linda Burnham (see below) all belong to the same communications group headed by Ms. Shelley Bird, Executive Vice President, Global Communications.

53.     Ms. Linda Burnham was the Meeting and Events Manager at Cardinal's McGaw Park, Illinois office until mid-2007, when she was relocated to the Dublin Headquarters.

54.     On August 27, 2005, Ginmar learned of a $75,000 custom order for Steuben crystal products which had been placed by Burnham with a supplier other than Ginmar for an annual awards event.  The order had been placed by Burnham, despite the fact that Ms. Terry Stentz, Director of Strategic Sourcing at Cardinal, had apparently directed Burnham to order the merchandise with Ginmar.

55.     Notwithstanding the explicit direction of her superior, Burnham defiantly purchased the product from the third party supplier.  Ginmar again made strong objections to

senior Cardinal management with respect to this transaction, who again assured Cantave that such incidents would not happen again.

56.    In 2006, Burnham temporarily adhered to the contract and purchased the Steuben crystal products from Ginmar for the annual awards event.

57.    On August 15, 2007, however, in anticipation of the annual awards event, Ginmar again approached Burnham via email and advised her that the Steuben products she had ordered the previous years were available for purchase at her demand.  Burnham coyly replied that Cardinal was no longer buying Steuben crystal items for that awards event.  When Ms. Chester, of Ginmar, sent a return email suggesting that Ginmar could provide a variety of substitute products for the awards event in the place of Steuben crystal, Burnham provided no reply and placed no order whatsoever for the event with Ginmar.

58.    Cantave brought the above incident to the attention of Lamont Robinson, her Corporate Sponsor.  In an apparent attempt to induce Burnham to adhere to the contract, Robinson made efforts to set up a meeting between Cantave and Burnham to discuss the partnership between Cardinal and the minority supplier and to address any possible problems or misunderstandings.  However, Burnham persistently declined such invitations, despite Cantave herself having made numerous follow-up phone calls to her.  None of these phone calls were ever returned.

59.    During the month of September, 2005, Ms. Jennifer Conner made several requests for quotes and samples for a polo shirt project which were expedited, upon her request.  Ms. Vickie Chester of Ginmar dedicated time researching available products and expediting samples for Conner's review.  In an email dated September 28, 2005, Chester writes, in part, "I'm following up on your polo shirt request, can you please let me know if there is anything you need

from us regarding this project." Conner replied, in part, "Thanks for sending them (the polo shirt samples) – we actually decided to go with another vendor with shirts that were a little more what we were looking for – Please let me know if you need me to send the ones you sent to me back – I don't need them anymore!!  Thanks again."

60.    Despite this incident having transpired early in the parties' new contract, Chester was alarmed at Conner's email and brought the matter to Cantave's attention.  Cantave, in turn, wrote an email to Erin Smith, Manager of Strategic Sourcing at Cardinal, on September 28, 2005, which read in part, "I'm puzzled about her (Conner) response to Vickie's email.  We provided quotes and samples for all of her requests.  After she received the samples and without providing us with any feedback, she has decided to use another vendor… please let me know your thoughts on this issue." Ms. Smith replied on September 29, 2005:  "That's concerning.  I have left a message for Jennifer.  I will give you an update in the next few days."  No such update was forthcoming.

61.    Notwithstanding the foregoing events, Cardinal led Ginmar to believe in its continuing good faith as an exclusive customer that the contract was being substantially complied with.  Ginmar received significant orders for Cardinal's major corporate promotional initiative, the Retail Business Conference ("RBC"), in both 2005 and 2006, and earned glowing reviews for its performance with respect to same from Ms. Kris Rosenberg, (then Manager of Strategic Sourcing at Cardinal), and others in an email dated July 27, 2006.  Ms Rosenberg writes, in part, "FYI, I heard you did an excellent job at RBC… Thanks from Cardinal!" Accordingly, Ginmar had no reason whatsoever to believe that its client was unsatisfied with its SDB supplier's performance under the contract, either as a supplier or as a protégé.

62.    In or about May or June 2006, Ms. Nikki Frazier, then Manager of Strategic Sourcing at Cardinal, placed a call to Cantave in which she asked her to "brace for a dramatic increase in custom promotional product sales" and inquired whether Ginmar was prepared to handle such a significant increase in volume.  Cantave assured Frazier that her company would be ready and accordingly secured new business premises, which were twice the square footage of Ginmar's existing office space, hired additional staff members, and otherwise geared up for the expected flurry in sales.

63.    In an email to Cantave, dated August 30, 2006, Rosenberg wrote:  "I know that since your company began the Mentor-Protégé Program with Cardinal, there have been many changes within the Sourcing group and perhaps you did not receive the support you needed from us."  This frank admission, while welcome, was not followed up with action that would lead to the promised increase in business and income.

64.    At a subsequent meeting with Rosenberg on October 23, 2006, in Dublin, Ohio, also attended by Ms. Cassandra Ward of Ginmar, Rosenberg apologized for the slipshod manner in which Linda Morgan had, in the past, handled compliance issues with respect to the contract. Rosenberg also acknowledged Cantave's statement that Blumenauer always had negative comments about Ginmar to which Rosenberg replied, "I know that Betty is not a fan of Ginmar." Rosenberg again apologized to Cantave for Cardinal's failure to provide Ginmar the support and guidance that it should have provided as a mentor.  Rosenberg further assured Cantave that Ginmar would be receiving a three-year contract extension with Cardinal, as had been previously promised, commencing in or about March, 2007.

65.    On October 25, 2006, Lamont Robinson sent Cantave an email to reiterate Kathy Benn's request that Cantave and her local sales representative, Ms. Ward, attend the South

Central Ohio Minority Business Council on November 10, 2006 and be seated at Cardinal's table at the gala where Mr. Kerry Clark, Cardinal President and Chief Executive Officer of Cardinal, would serve as the keynote speaker.  It was subsequently explained to Cantave that Cardinal was on a list of candidate companies eligible to be nominated for an award that recognized an organization's commitment to supplier diversity and that, as such, Cardinal wanted its own minority suppliers visibly present for the gala.  Accordingly, Cantave and Ward attended the gala, which was another thinly veiled opportunity for Cardinal to further its own business agenda at the expense of Cantave.

66.    On November 6, 2006, Blumenauer, through her assistant, Amy Farkasovsky, placed an order with Ginmar in relation to the "Worldwide Finance Leadership Award". Such order was taken by Ms. Cassandra Ward, Ginmar's Sales Representative in Dublin, Ohio. Blumenauer subsequently complained that the order was taking too long to process and expressed her concerns to Rosenberg.

67.    In a mid-November 2006 conference call with Cantave, Blumenauer accused Ward of being unknowledgeable and inconsistent.  Blumenauer's comments were surprising in that she, herself, had interviewed Ward for the position as Ginmar's Sales Rep. in Dublin, and had approved of her hire.  Moreover, during a June 8, 2007 conference call with Cantave, Mr. Mike Zabonik would make a point of stating that to his knowledge there had been no negative feedback regarding the job performance of Ward.

68.    As a result of Blumenauer's comments, Ginmar dutifully prepared a timeline of events with respect to the order in question for Rosenberg, who, after evaluating the facts, stated to Cantave in a conference call on or about November 30, 2006, that she could find no errors with respect to the order on the part of Ward.  Notwithstanding this fact, Rosenberg suggested to

Cantave that Blumenauer be permitted to "go outside the contract" and order from other suppliers, in order to, as she put it, "get Betty off my back." Cantave steadfastly rejected any such proposal.

69.    Notwithstanding the foregoing, it has now become apparent to Ginmar, upon a review of the circumstances, that Rosenberg, with the knowledge of Wagner, gave Blumenauer permission to go ahead and use third party suppliers, without Cantave's knowledge and consent and in contravention of the contract.

70.    In fact, despite Ginmar's vulnerable position and status as Cardinal's protégé, Cantave would be deliberately deceived by the words and comportment of Cardinal officials thereafter into believing that her contractual status was secure.

71.    In the months that followed, Ginmar's sales volumes dropped dramatically.

72.    Given its commitment to Cardinal as an exclusive supplier and the promises the mentor company had made with respect to volumes of sales and contractual longevity, Ginmar had foregone significant opportunities with other clients and became substantially reliant upon Cardinal as its essential revenue source and mentor. By 2006, Cardinal represented over 60% of Ginmar's sales volume.

73.    Justly alarmed at the dramatic decrease in sales and seeking explanation for same, Cantave made numerous telephone calls to Zabonik from February 2007 through May of 2007. However, not one of these calls was returned.

74.    Upon information and belief, Jen Walsh, a member of Blumenauer's clique, had by this juncture become a 51% owner of the Callard Company and the Callard Company[2] had

---

[2] From the beginning Blumenauer tried to drive business to Walsh/Callard and away from Cantave; on information and belief Callard received thousands in orders from Cardinal.

received status as a federal woman owned subcontractor by December 2006, a period which

coincided with a marked and massive reduction in orders sent to Ginmar from Cardinal.

75.    Ginmar had looked forward to receiving orders for the 2007 Retail Business

Conference ("RBC") as had been the case in the two years prior, and the boost in revenues that

such event had annually generated.  The RBC is an enormous conference that Cardinal hosts

each year for its many retail pharmacy clients; it is a vital opportunity for the sale of custom

promotional products.   Ginmar had negotiated the contract with Cardinal with the RBC in mind

and had in fact received over $100,000 in business in 2005 and 2006 from the RBC.

76.    Orders for the event were not forthcoming, nor was there any explanation for their

absence.  In fact, a review of the correspondence during the period of November 2006 to June

2007 between Ginmar employees and those at Cardinal responsible for ordering for the event,

substantiate the theory that there existed a coordinated effort to deceive Ginmar and deprive the

diverse supplier of such business.  Samples were ordered by Cardinal, false promises were made,

reassurances were given and yet no orders actually materialized.  Employees at Cardinal

corporate headquarters flagrantly requested from Ginmar a catalog of promotional products;

Ginmar supplied the catalog in good faith only to see Cardinal employees order products directly

from the distributors therein, completely circumventing Ginmar.

77.    Ginmar notes that the decline in orders for the 2007 RBC event coincided with a

change in Cardinal staff responsible for the event.  In an email dated February 7, 2007, Ms.

Becky Hoag, Specialist, Meetings and Events, wrote to Ms. Ward at Ginmar as follows:  "Hi

Cassandra, I wanted to let you know of a little change that we recently made.  Jen McEwen will

be the lead for the RBC 2007 show promotional items.  Her contact information is below.  I will

be available as a reference but I suggest you meet with Jen to go through the 2007 show. Thanks for all of your help the last 12 months!"

78. On February 19, 2007, a business review meeting was attended by Cantave and Cardinal executives Bob Wagner, Mike Zabonik, the new Director of Procurement Services, Joe Crawford, a Cardinal business manager, and Lamont Robinson.

79. During this meeting, Cantave was presented with two evaluation documents; one of which purported to be a list of "feedback" statements made by Cardinal executives about Ginmar, and the other of which was a more formal, opinion poll type survey taken anonymously among the hundreds and hundreds of Cardinal executives Ginmar worked with. In the first document, several of the statements were negative in tone. However, the sources of these statements were neither provided nor identified. Moreover, the author or authors who compiled this "evaluation" were not identified, neither were the dates the alleged statements were taken or the time period to which they purportedly related.

80. In stark contrast, the second survey that was presented, and which appeared to be a formal performance evaluation of Ginmar for 2006, rated Ginmar as having achieved a score well above the target level in 100% of the categories listed. In addition, Ginmar achieved a 94% accuracy rating for 250 orders in 2005 and a 98% accuracy rating for 460 orders (nearly double) in 2006.

81. In response to the foregoing, Bob Wagner made the observation that the two aforementioned evaluations of Ginmar appeared to be so radically different that it was "as if they related to two different companies." Also, upon reviewing 2006 sales volumes, Wagner expressed surprise at how low Ginmar's revenues from Cardinal had been, stating, "I wonder

how much Callard is getting."  Cantave was highly disturbed and taken aback by this comment, stated as it was by Cardinal's V.P. of Strategic Sourcing.

82.    Also at the above noted meeting, additional data was presented that showed the numerous and repeated efforts Ginmar had made at improving efficiencies by creating and revising forms and procedures for Cardinal over the preceding two years.  None of these efforts had borne fruit, due to the revolving door of procurement directors at Cardinal that the diverse supplier had been directed to work with, i.e., Ms. Linda Morgan, Ms. Erin Smith, Ms. Nikki Frazier and Ms. Kris Rosenberg.

83.    At that same meeting, Wagner asked Cantave to grade the level of support Ginmar had received from Cardinal on a scale of "A" to "F".  Cantave replied, diplomatically, by giving a grade of a "low C" and pointed out the fact that in particular, Blumenauer always seemed to have "issues" with Ginmar, to which Wagner replied, "I know".  Wagner then suggested that given the nature of the relationship between the two companies, Cardinal could do much to improve.  He advised Cantave to stay in close touch with Zabonik, who would henceforth work with her to navigate and manage Ginmar's relationship with Cardinal executives.

84.    Zabonik thereupon assured Cantave that he would be in touch to discuss the issues with executives.

85.    After the February business review meeting, Wagner sent Cantave an email stating, "We look forward to working with your team throughout the process."

86.    On February 28, 2007, Robinson sent Cantave an email reading, in part:

"I've been thinking about the level (or lack) of resources or knowledge deployed to assist the growth of your company… It appears as if we may be going out to bid in the near future… Please understand that I'm not sending this message to alarm you, or that I believe you were struggling." … he continues, "Believe me, I'm very disappointed in the

turnover and the negative impact it has had on our diverse suppliers.  I also handle the commercial print category, for which I've been trying to find opportunities with a diverse printer in Chicago.  Linda went out to their facility, they flew to Dublin, we had a solid game plan in place to partner with them, but then Linda left, I then had to introduce them to 3 other people in a period of a year.  I'm a little gun shy to introduce them to Mike for fear that he will leave also.  It's a mess."… "I've told Mike and Bob that Cardinal failed to assist you with your growth in the beginning of the partnership, which led to some operational inefficiency.  Since some people in Dublin remembered this, I think they fail to see the major improvements you've made throughout the last couple of years."

87.    Thereafter, the process went on for three months without any communication to Ginmar from Zabonik or other Cardinal officials with respect to Cardinal's intentions.  This complete lack of communication took place despite Cantave calling Zabonik numerous times and each time leaving a message requesting a meeting to discuss the contract and other matters.  Zabonik did not return any such calls.

88.    On May 24, 2007, Zabonik sent Cantave an email that read in part:  "I have obtained approval from the communications team executives to conduct a bidding event in the next few weeks, with the most optimal providers… I am beginning to collect the event criteria, and I will be inviting Ginmar as the incumbent provider of custom promotional items."

89.    It is now apparent that the "Communications Team" to which Zabonik refers in his email was comprised of the very staff members who had made it their business to sabotage Ginmar's relationship with Cardinal from the outset: Blumenauer, Burnham, McEwen, and others.  The "critiques" by such individuals had begun as early as the second day of the contract's existence and such is a testament to their lack of credibility.

90.    These critiques are contradicted by the stellar references from Ginmar's other corporate clients as well as by over one hundred emails from Cardinal managers and purchasers thanking Cantave and Ginmar and praising their work.

91.     On June 8, 2007, eight days after the contract had automatically renewed, a teleconference was held between Cantave and Vickie Chester of Ginmar and Zabonik and Robinson of Cardinal.  Contemporaneous minutes of the conference were taken by Ginmar staff, with the prior knowledge and consent of Zabonik and Robinson.

92.     During the conference call, Zabonik confirmed his understanding that Ginmar was still under contract with Cardinal Health.  In acknowledging that the contract had automatically renewed under the convenience clause, Zabonik stated that "in no way will we say you (Ginmar) are out [with respect to being Cardinal's supplier] right now, because of the contract."  Robinson noted to Zabonik that there had been inner turmoil with executives' compliance to follow the contract since the beginning of the contract.  Zabonik stated, "Issues have been with Dublin (primarily) and San Diego contacts.  In Dublin, people will listen and react to Blumenauer.  ***Betty is not compliant with Ginmar or anyone else.***"  Zabonik further stated that "***there is a lackadaisical attitude toward suppliers within Cardinal Health, a lot of vendors are in the same position as Ginmar***."  When Robinson asked if there were any penalties for non-compliance of executives with the contract, Zabonik replied there would not be.

93.     Cantave inquired as to why Ginmar had not received business from Cardinal for the 2007 RBC, and particularly noted that there had been no communication or response to Ginmar's communication attempts to RBC executives at Cardinal, with respect to the event.  Zabonik then revealingly stated that he was unsure as to who had given RBC executives permission to order from different suppliers.  Robinson went on to express that Ginmar simply wanted to be treated fairly and should be so treated, an exclamation which he made twice during the conference call.

94.     As a result of Cardinal's breach of contract, Ginmar has been forced to lay off most of its staff and is experiencing dire financial circumstances.  The credit rating and good name of the company have suffered and Cantave, whose own credit rating has been severely damaged, has of necessity taken out emergency loans at above-market rates of interest in order to keep her company afloat. Ginmar furthermore has been deprived of other business opportunities which it could have pursued, but for its devotion to Cardinal as an exclusive supplier and protégé and its detrimental reliance upon Cardinal's false claims of good faith.

95.     Cardinal breached its contract with Ginmar.

96.     The PPA was drafted by Defendant.

97.     The PPA is a requirements contract within the meaning of the Ohio Uniform Commercial Code.

98.     Defendant acted with malice throughout.

99.     Cantave has been dealing with Cardinal for over nine years.  Cantave and Ginmar have expended over 6,500 hours in time and labor fulfilling orders, designing, constructing, and maintaining a custom designed e-store for Cardinal, engaging in weekly conference calls with Cardinal and exchanging roughly 10,000 email messages.

100.     Cantave traveled to Cardinal headquarters and numerous locations around the country to visit every Cardinal business division.  Between 2005 – 2007, Cantave traveled virtually every month, and sometimes several times a month, for business meetings, sample shows, Cardinal events, and to promote Cardinal's supplier diversity initiatives, always at her own substantial expense.

101.    Ginmar also incurred roughly $650,000 in additional expenses – travel, staff, furniture, equipment, employees, rent, overhead, etc. – to accommodate the increased orders that Cardinal repeatedly promised her.

## COUNT I

### Breach of the PPA by the Defendant.

102.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

103.    Upon information and belief, the PPA was an exclusive requirements contract for goods and services in which the terms of sale were measured by the quantity of the requirements of the Defendant-Buyer.

104.    Upon information and belief, Defendant was under a duty of good faith to Ginmar.

105.    Upon information and belief, Defendant placed orders for custom professional products with suppliers other than Ginmar.

106.    Defendant breached the exclusive, requirements contract with Ginmar by placing orders for custom professional products with suppliers other than Ginmar.

107.    Defendant was derelict in its duty of good faith to Ginmar by placing orders for custom professional products with suppliers other than Ginmar.

108.    Defendant acted with malice in breaching the PPA.

## Count II

### Promissory Estoppel

109.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

110.    Upon information and belief, Defendant made numerous clear and unambiguous promises to Plaintiffs prior to and over the course of the PPA, both in Plaintiffs' capacity as MBE/WBE SDB supplier and protégé.

111.    Plaintiffs relied on the promises made by Defendant.

112.    Upon information and belief, Plaintiffs' reliance on Defendant's promises was reasonable and foreseeable.

113.    Plaintiffs were injured by their reliance on Defendant's promises.


## Count III

### Fraudulent Misrepresentation

114.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

115.    Upon information and belief, Defendant falsely and with knowledge of the falsity thereof, and with the intent that Plaintiffs rely on the misrepresentation, represented to Plaintiffs the material fact that Plaintiffs were the exclusive providers of custom promotional products under the PPA.

116.    Upon information and belief, Defendant falsely and with knowledge of its falsity, concealed from Ginmar and Cantave the material fact that it had given its employee Betty Blumenauer and, by extension, other of Defendant's employees, permission to go outside the PPA and place orders for custom professional products with suppliers other than Ginmar thus depriving Ginmar and Cantave of the benefits of the PPA.

117.    Upon information and belief, notwithstanding knowledge of the above, Defendant made further fraudulent misrepresentations, with the intent of misleading Ginmar and Cantave into relying upon them, at a February, 2007 business review meeting to the effect that Defendant's employee Mike Zabonik and other officials in its employ would be working closely with Cantave to ensure continued implementation of the PPA.

118.    Upon information and belief, Defendant knew that Ginmar would not be receiving orders for its 2007 Retail Business Conference event but knowingly and with intent that Ginmar rely upon its misrepresentations, misled Ginmar into believing that the event would provide substantial revenues for the minority supplier, as it had done in the two years prior.

119.    Upon information and belief, Defendant's employees implemented the above fraud, in part, by obtaining a catalog of suppliers from Ginmar and thereupon circumvented Ginmar entirely by ordering products directly from other distributors identified in the catalog supplied by Ginmar.

120.    Upon information and belief, Plaintiffs were justified in relying on the above misrepresentations of Defendant.

121.    Upon information and belief, Ginmar and Cantave suffered injury proximately caused by reliance on Defendant's fraudulent misrepresentations.  Ginmar and Cantave suffered devastating financial losses which could have been mitigated by Ginmar soliciting and taking on other major clients and/or cutting business expenses in anticipation of dramatically decreased sales volumes from its primary client and mentor.

122.    Upon information and belief, Defendant acted with malice in making fraudulent misrepresentations to Ginmar and Cantave.

## Count IV

### Negligent Misrepresentation

123.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

124.    Plaintiffs repeat and incorporate paragraphs 37 through 44 above and plead, in the alternative to fraudulent misrepresentation, that Defendant failed to exercise reasonable care in making the misrepresentations alleged above.

## Count V

### Tortious Interference

125.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

126.    Upon information and belief, as alleged above, the PPA was a valid and enforceable contract between Plaintiffs and Defendant.

127.    Upon information and belief, as alleged above, Defendant was aware of the contractual relation between itself and Plaintiffs.

128.    Upon information and belief, as alleged above, Defendant intentionally and without justification induced a breach of the PPA.

129.    Upon information and belief, as alleged above, Defendant's breach of the PPA was caused by its own wrongful conduct.

130.    Upon information and belief, as alleged above, Plaintiffs were severely damaged by Defendant's conduct.

## Count VI

## Defamation of Character

131.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

132.    Upon information and belief, Betty Blumenauer, an employee of Defendant, made unsubstantiated defamatory statements presented as factual criticism, with respect to Ginmar's performance and capabilities knowing those statements to be false.

133.    Upon information and belief, throughout 2005 and 2006 Blumenauer waged an internal campaign within Cardinal to defame Ginmar and Cantave and to sabotage the contract.

134.    Upon information and belief, Blumenauer made these statements with malice and knowing them to be false.

135.    Upon information and belief, Blumenauer was neither penalized nor sanctioned for her malicious behavior.

136.    Upon information and belief, Defendant approved Blumenauer's behavior.

137.    Upon information and belief, Cardinal Health is vicariously liable for Blumenauer's defamatory statements.

138.    Upon information and belief, Blumenauer and Defendant acted with malice in defaming Plaintiffs' character.

## Count VI

## Civil Conspiracy

139.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

140.    Upon information and belief, at least two of Defendant's employees combined with malice to injure Plaintiffs resulting in actual damages to the Plaintiffs as alleged above.

## Count VII

### Breach of Fiduciary Duty

141.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

142.    Upon information and belief, Defendant voluntarily assumed the fiduciary duty of mentoring and benefiting Plaintiffs under its Diversity Initiative and bound itself to do so under the mentor-protégé relationship as agreed upon in the MPA.

143.    Upon information and belief, Defendant occupied a position of special confidence and trust and enjoyed a position of superiority or influence acquired by virtue of that special confidence and trust.

144.    Upon information and belief, Defendant, as fiduciary, owed Plaintiffs a duty of good faith and loyalty.

145.    Upon information and belief, Defendant breached its fiduciary duty by abusing its relation of trust and confidence for personal aggrandizement.

146.    Upon information and belief, Defendant failed in its fiduciary duty by failing to make full disclosure of facts including, but not limited to, its decision to allow Blumenauer to "go outside the contract ('the PPA')".

## Count VII

### Breach of Voluntarily Assumed Duty and
### Negligent Performance of Undertaking to Render Services

147.     Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

148.     Upon information and belief, Defendant voluntarily assumed a special mentor-protégé duty as documented in the MPA.

149.     Upon information and belief, Defendant abused this special duty for personal aggrandizement by, among other things, promoting itself as being committed to diversity in order to secure lucrative government contracts.

150.     Upon information and belief, Defendant undertook to assist the Plaintiffs to develop and thrive as a small business entity but instead contributed in large part toward Plaintiffs' financial ruin.

151.     Upon information and belief, Defendant did not perform its duty as a mentor fiduciary with the ordinary standard or care expected of it under the law and indeed showed a reckless disregard for Plaintiffs' welfare.

152.     Upon information and belief, Defendant failed to exercise reasonable care in performing its undertaking and that failure increased the risk of harm to Plaintiffs.

153.     Upon information and belief, Plaintiff suffered harm because of its reliance upon Defendant's promises under the MPA, the PPA, and elsewhere.

154.     Upon information and belief, Defendant was clearly negligent in its duties both as a mentor and fiduciary.


**Count VIII**

**Enforcement of Third Party Beneficiary Rights**

155.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

156.    Upon information and belief, Defendant at all relevant times was, and still is, a prime contractor to the United States federal government.

157.    Upon information and belief, Defendant is bound to comply with federal legislation and regulations whose goal is to protect the interests of Small Disadvantaged Businesses ("SDBs"), such as Plaintiff Ginmar.

158.    Through Federal Acquisition Regulation ("FAR") 19.702, *et seq.*, the federal government places a positive obligation upon prime contractors to uphold its stated imperatives with respect to the inclusion of small disadvantaged businesses in opportunities awarded by the taxpayer.

159.    FAR 19.704(a)(1) requires prospective contractors to include "Subcontracting Plans" in support of their bid for certain government contracts, indicating the contractor's percentage goals for utilizing small disadvantaged businesses as subcontractors.

160.    FAR 19.704(a) (8) requires prime contractors to ensure that SDBs receive an "equitable opportunity to compete for subcontracts."

161.    FAR 19.702 requires that MBE/WBE SDBs be given the "maximum practicable opportunity to participate in contract performance."

162.    Under FAR 19.702(c), failure by a prime contractor to make a good faith effort to comply with a subcontracting plan is deemed to constitute a material breach of a federal contract and carries the burden of liquidated damages.

163.    Upon information and belief, Defendant did not give Plaintiffs the maximum practicable opportunity to participate in contract performance.

164.    Upon information and belief, Defendant failed to make a good faith effort to comply with a subcontracting plan involving Plaintiffs.

165.    Upon information and belief, Defendant was a party to federal contracts in which it asserted Ginmar as an intended SDB/MBE/WBE supplier or as part of a class of intended SDB/MBE/WBE suppliers.

166.    Upon information and belief, Plaintiffs were intended third party beneficiaries to the federal contracts referenced above.

167.    Upon information and belief, Plaintiffs have enforceable rights under the federal contracts referenced above.

168.    Upon information and belief, Plaintiffs are entitled to their share of any and all benefits that were intended to be bestowed by the federal authorities to SDB/MBE/WBE's in the negotiation and award of prime contracts.


## Count IX

### Illegal Discrimination Under 42 U.S.C. § 1981

169.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

170.    Upon information and belief, Defendant deprived Cantave and Ginmar of the equal right to make and enforce contracts as is enjoyed by white citizens.

171.    Upon information and belief, Defendant deprived Cantave and Ginmar of the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

## Count X

### Illegal Discrimination Under 775 ILCS 5/, The Illinois Human Rights Act

172.     Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

173.     Upon information and belief, Defendant deprived Cantave and Ginmar of their freedom from discrimination because of race, color, and/or national origin.

## Count XI

### Illegal Discrimination Under Ohio Revised Code Chapter 4112

174.     Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

175.     Upon information and belief, Defendant discriminated against Cantave and Ginmar on the basis of race, color, and/or national origin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare that Defendant's failure to make a good faith effort to comply with a subcontracting plan involving Plaintiffs violates applicable law including without limitation:

(i)   Federal Acquisition Regulations 19.702, *et seq.*;

B.     Award equitable relief, including without limitation, a preliminary and permanent injunction prohibiting Defendant's continued or future illegal failure to make good faith efforts to comply with subcontracting plans:

C.     Award compensatory damages to the Plaintiffs as follows:

(i) for Defendant's breach of the PPA, Special Damages against Defendant to compensate Plaintiffs for direct losses.

(ii) for Defendant's breach of the PPA, Consequential/Economic Damages against Defendant to restore Plaintiffs to the economic position that they expected from performance of the promises made by Defendant.

(iii) for Defendant's fraudulent conduct, Special Damages against Defendant to compensate Plaintiffs for direct losses.

D.    Award punitive damages to the Plaintiff for Defendant's malicious conduct.

E.    Award to Plaintiffs attorneys' fees and other costs of suit to the extent permitted by law.

F.    Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby request a jury trial for all issues triable by jury including, but not limited to, those issues and claims set forth in any amended complaint or consolidated action.

DATED:  July 21, 2008                                    GINMAR CORPORATE PROMOTIONS,
                                                         INC. and GINA CANTAVE.

                                                         By: /s/ Steven E. Schwarz
                                                         Steven E. Schwarz, Esq.
                                                         The Law Offices of Steven E. Schwarz, Esq.
                                                         2461 W. Foster Ave., #1W
                                                         Chicago, IL 60625
                                                         Tel:  (773) 837-6134
                                                         Fax:  (773) 275-0202

                                                         One of their attorneys

Carl J. Mayer, Esq.                                      Walter Dale, Esq.

MAYER LAW GROUP LLC                     Law Offices of Walter R. Dale
1040 Avenue of the Americas, Suite 240  105 W. Madison Ave., 23rd Floor
New York, NY 10018                      Chicago, IL 60602
DIRECT: (212) 382-4686
FAX: (212) 382-4687


                                        Attorneys for Plaintiffs